IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

MICHAEL JAMES SPRATT,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

Nos. C11-2015 and C11-2021

RULING ON JUDICIAL REVIEW

---

**TABLE OF CONTENTS**

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . 3

III.   *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     A.    *Spratt's Education and Employment Background* . . . . . . . . . . . . . 6
     B.    *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . 7
          1.    *Administrative Hearing on May 21, 2008* . . . . . . . . . . . . 7
              a.    *Spratt's Testimony* . . . . . . . . . . . . . . . . . . . . . 7
              b.    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . 8
          2.    *Administrative Hearing on April 15, 2010* . . . . . . . . . . . 10
              a.    *Spratt's Testimony* . . . . . . . . . . . . . . . . . . . . . 10
              b.    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . 12
     C.    *Spratt's Medical History* . . . . . . . . . . . . . . . . . . . . . . . 14

V.    *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . 20
     A.    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . 20
          1.    *The ALJ's August 27, 2008 Decision* . . . . . . . . . . . . . 21
          2.    *The ALJ's April 19, 2010 Decision* . . . . . . . . . . . . . . 22
     B.    *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . 23
          1.    *Substance Abuse* . . . . . . . . . . . . . . . . . . . . . . . 24
          2.    *Listing 12.05C* . . . . . . . . . . . . . . . . . . . . . . . . 27

        3.    *Dr. Garrelts' Opinions* . . . . . . . . . . . . . . . . . . . . . . . . . 31
        4.    *RFC Determination* . . . . . . . . . . . . . . . . . . . . . . . . . 37
        5.    *Credibility Determination* . . . . . . . . . . . . . . . . . . . . 38
    C.    **Reversal or Remand** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VI.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

VII.   **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) in case number 6:11-cv-2015-JSS, filed by Plaintiff Michael James Spratt on May 10, 2011; and the Complaint (docket number 3) in case number 6:11-cv-2021-JSS, filed by Spratt on May 27, 2011.[1]  In both complaints, Spratt requests judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits, filed in 2005 and 2008 respectively.  Spratt asks the Court to reverse the decisions of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits.  In the alternative, Spratt requests the Court to remand these matters for further proceedings.

---

[1] The Court elects to address both complaints in the same ruling, as both complaints involve the same parties and the same or similar facts and issues.  The first case, number 6:11-cv-2015-JSS, involves applications for disability insurance benefits and SSI benefits filed in 2005.  A final decision by the Social Security Administration ("SSA") was rendered in those applications in 2008.  Following the SSA's 2008 denial of benefits, Spratt, in September 2008, filed new applications for disability benefits and SSI benefits. A final decision by the SSA was issued in the new applications in 2010.  Spratt seeks judicial review by this Court in both sets of applications.  In summary, both sets of applications will be considered together in this ruling.

## II. PROCEDURAL BACKGROUND

On December 30, 2005, Spratt applied for both disability insurance benefits and SSI benefits.[2] In his applications, Spratt alleged an inability to work since October 1, 2005 due to back problems, depression, and bipolar disorder. Spratt's applications were denied on April 12, 2006. On August 24, 2006, his applications were denied on reconsideration. On October 9, 2006, Spratt requested an administrative hearing before an Administrative Law Judge ("ALJ"). On May 21, 2008, Spratt appeared via video conference with his attorney before ALJ Denzel R. Busick for an administrative hearing. Spratt and vocational expert Carma Mitchell testified at the hearing. In a decision dated August 27, 2008, the ALJ denied Spratt's claims. The ALJ determined that Spratt would not be disabled if he stopped his substance use because he would be able to perform his past relevant work as a sander, cleaner, fast food worker, or dietary aide. Spratt appealed the ALJ's decision.

On October 7, 2008, following the ALJ's August 27, 2008 decision denying his applications for benefits, Spratt again applied for both disability insurance benefits and SSI benefits.[3] In this second set of applications, Spratt alleged and inability to work since August 28, 2008 due to depression and bipolar disorder. Spratt's applications were denied on March 13, 2009. On April 29, 2009, his applications were denied on reconsideration. On May 6, 2009, Spratt requested an administrative hearing before an ALJ. On April 5, 2010, Spratt appeared via video conference with his attorney before ALJ Busick for an administrative hearing. In a decision dated April 19, 2010, the ALJ denied Spratt's claims. The ALJ determined that Spratt was functionally capable of performing his past work as a sander, dietary aide, or floor wax machine operator. Spratt appealed the ALJ's decision. On April 21, 2011, the Appeals Council denied Spratt's requests for review on both his 2005 applications and 2008 applications. Consequently, the ALJ's August 27, 2008 and April 19, 2010 decisions were adopted as the Commissioner's final decisions.

---

[2] These applications are associated with case number 6:11-cv-2015-JSS.

[3] These applications are associated with case number 6:11-cv-2021-JSS.

On May 10, 2011, Spratt filed an action for judicial review of the ALJ's 2008 decision. On May 25, 2011, Spratt filed an action for judicial review of the ALJ's 2010 decision. The Commissioner filed Answers on August 31, 2011 and October 28, 2011, respectively. On September 26, 2011, Spratt filed a brief in case number 6:11-cv-2015-JSS, arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he could perform his past relevant work as a sander, cleaner, fast food worker, or dietary aide. On November 22, 2011, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. Similarly, on November 16, 2011, Spratt filed a brief in case number 6:11-cv-2021-JSS, arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he could perform his past relevant work as a sander, dietary aide, or wax machine operator. On January 13, 2012, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On July 28, 2011, in case number 6:11-cv-2015-JSS, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c). Similarly, on September 7, 2011, in case number 6:11-cv-2021-JSS, both parties consented to proceed before a magistrate judge for resolution of this matter.

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.*

at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Spratt's Education and Employment Background

Spratt was born in 1981. He is a high school graduate. Spratt suffered from multiple learning disabilities, and needed special education courses throughout his schooling. At both administrative hearings, Spratt testified that he could not read a newspaper or write a letter. He also stated that he could not perform simple math. In 1990, while in the third grade, Spratt took the Wechsler Intelligence Scale for Children examination. Spratt had a verbal IQ score of 67, performance IQ score of 63, and full scale IQ score of 62. A school psychologist concluded that he scored in the mild mental disabilities range both cognitively and adaptively. In 1994, he was given another IQ test, and had a verbal IQ score of 65, performance IQ score of 66, and full scale IQ score of 63. A school psychologist concluded that "[Spratt] is a 12 year old sixth grader who is currently functioning within the mental disabilities range of intellectual ability."[4]

---

[4] Administrative Record at 378 in case number 6:11-cv-2021-JSS.

The record contains an earnings report for Spratt. The report covers Spratt's employment history from 1997 to 2009. From 1997 to 2005, Spratt earned between $1,040.30 (1998) and $29,478.37 (2005). He had no earnings in 2006. He returned to work in 2007, and earned $1,841.14. In 2008, he earned $89.13, and in 2009, he earned $1,684.00.

### B. Administrative Hearing Testimony

#### 1. Administrative Hearing on May 21, 2008

##### a. Spratt's Testimony

At the administrative hearing, Spratt's attorney inquired whether Spratt believed he was capable of performing any of his past work. Spratt answered that he was unable to do any type of work because "I can't handle the stress. I get too frustrated. I get angry and then I get in trouble and then lose my job. It's just too much for me."[5] Next, Spratt's attorney asked Spratt to discuss his mental health problems:

> Q: Are you depressed?
> A: A little bit.
> Q: All of the time or some of the time?
> A: Some of the time.
> Q: Do you have a lot of interest in doing things or not much?
> A: Not much.
> Q: Is concentration a big problem for you?
> A: Yes, it is.
> Q: If you try to start some task are you able to stay focused on the task and get it done?
> A: No.
> Q: Does your mind wander?
> A: Yes.
> Q: How do you get along with people?
> A: Not very good.
> Q: Do you get angry with them?
> A: Yes.
> Q: Is it all people?
> A: Yes.

---

[5] *Id.* at 709 in case number 6:11-cv-2015-JSS.

| Q: | Do you have a problem with authority figures? |
|---|---|
| A: | Yes. |
| Q: | What problem do you have? |
| A: | Angry, don't want to listen to them, try to -- you know, when they catch me in the act doing something I try to deny it and I just can't stay focused. . . . |
| Q: | Are you able to follow either written or oral instructions that people give to you? |
| A: | No. |
| Q: | Either one? |
| A: | No. |
| Q: | Do you have difficulty understanding them or concentrating on them? |
| A: | I have difficulty understanding them. |

(Administrative Record at 709-710 in number 6:11-cv-2015-JSS.)

### b.   *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who is able to:

> work at medium level of work that could pick up 50 pounds . . . occasionally, 25 pounds frequently; sit six hours out of an eight-hour workday; stand and walk combined six hours; no limitation in the operation of hand controls or foot controls; no postural limitations; no manipulation limitations; no visual limits with glasses; there would be communication limits in the areas of reading and writing; no environmental limitations; person, however, at all times would have mild to moderate limits under activities of daily living, their social functioning and their concentration, persistence and pace. If they refrain from the use of illegal substances or alcohol, the person would generally function in the mild range in those respects, although they would, under stress, reach moderate limitations in regards to the ability to understand, remember and carry out detailed instructions, maintain extended concentration, interact appropriately with the general public, work with coworkers or in proximity to coworkers, accept instruction or criticism from supervisors, respond to changes in the work setting or their work routine.  Those moderate limits would be reached on an intermittent and unexpected basis depending upon the degree of stress the person find [*sic*]

> themselves under. Normally, they would be able to keep pace
> until somebody starts criticizing or pressing them for more.

(Administrative Record at 719-720 in case number 6:11-cv-2015-JSS.) The vocational expert testified that under such limitations, Spratt would be able to perform his past relevant work as a sander, cleaner, fast food worker, and dietary aide. The ALJ asked a second hypothetical that was the same as the first hypothetical except that he changed the nonexertional restrictions "such that instead of mild to moderate they might be in the same respect moderate to marked so that on an intermittent, unexpected basis they could reach marked limitations if criticized, placed under pressure or demands were made on them to do more."[6] The vocational expert testified that under such limitations, Spratt would be precluded from competitive employment.

Spratt's attorney also questioned the vocational expert. Spratt's attorney provided the vocational expert with the following hypothetical:

> Assume an individual 24 at their onset date; completed high
> school but with a special education program, very limited
> reading skills; that should not be placed in a position that
> would require reading, writing or simple math; would be
> limited to simple, routine, repetitive, unskilled work in a low
> or mild stress environment; no more than a regular pace, but
> a slow pace at least a third of the time; a marked or severe
> inability to maintain attention and concentration; is not able to
> respond -- process and respond to new verbal information; no
> contact with the public or coworkers and only occasional
> contact with supervisors; no close attention to detail; . . . and
> would miss more than four days of work per month due to the
> symptoms of his major depressive disorder.

(Administrative Record at 721 in case number 6:11-cv-2015-JSS.) The vocational expert testified that under such limitations, Spratt would be precluded from competitive employment.

---

[6] Administrative Record at 720 in case number 6:11-cv-2015-JSS.

## 2. Administrative Hearing on April 15, 2010

### a. Spratt's Testimony

At the second administrative hearing, Spratt's attorney asked Spratt why he believed he was unable to work. Spratt replied "[b]ecause [of] my bipolar, I just, I get frustrated and I want to do things my way."[7] Spratt's attorney questioned Spratt regarding his mental health problems:

> Q:  And you do have a depression, bipolar condition do you --
>
> A:  Yes.
>
> Q:  -- do you not? You have a lot of interest in doing things or not much?
>
> A:  Not much.
>
> Q:  How well do you deal with stress?
>
> A:  Not very well.
>
> Q:  What happens when you're under stress, if anything?
>
> A:  I get mad, I get upset, I break things.
>
> Q:  Do you ever physically injure somebody?
>
> A:  No.
>
> Q:  But you do get verbally abusive?
>
> A:  Yes.
>
> Q:  Do you have any difficulties concentrating and paying attention?
>
> A:  Yes, I do.
>
> Q:  How long do you think you can concentrate or pay attention on a task at a time before you get distracted?
>
> A:  Not that long.
>
> Q:  Would it be a number of minutes or hours?
>
> A:  Minutes.
>
> Q:  How many minutes?
>
> A:  Maybe 20, 25, somewhere around there[.]
>
> Q:  If you were in a work environment and your employer gave you two or three things that you needed to do, in other words, two or three instructions would you be able to do it?
>
> A:  No.
>
> Q:  What would happen?

---

[7] Administrative Record at 52 in case number 6:11-cv-2021-JSS.

| | |
|---|---|
| A: | I'd forget or I'd get frustrated and I'd ask again and they'd have to repeatedly tell me. And I get more frustrated, I get angry, I'd yell at them. . . . |
| Q: | Would it be accurate to say that you've had a lot of problems with co-workers? |
| A: | Um-hum, yes. |
| Q: | And quite a few problems with supervisors as well? |
| A: | Yes. |
| Q: | Do you have any problems remembering things? |
| A: | Yes, I do. . . . |
| Q: | And if somebody is giving you instructions or something to do, do you have any difficulty following along and understanding the instructions? |
| A: | Yes. |

(Administrative Record at 53 in case number 6:11-cv-2021-JSS.)

Next, Spratt's attorney inquired as to Spratt's physical abilities and limitations. Spratt testified that he could lift 25 to 30 pounds occasionally, but "not much" frequently. Specifically, Spratt testified that "I can't even lift 25 pounds anymore. I lift it up and I just sit it back down."[8] Spratt stated that his difficulty with lifting was the result of fatigue and tiredness. Spratt indicated that he could perform "a little bit" of yard work, but "not to the point where I have to lift things."[9] Spratt's attorney also asked Spratt to describe his typical day:

| | |
|---|---|
| Q: | What time do you get up in the morning? |
| A: | Usually not until noon. |
| Q: | Why do you get up so late? |
| A: | Because I have no motivation, none. |
| Q: | After you get up what do you do? |
| A: | I usually have, get up, drink a cup of coffee, feed and water the dog, smoke a cigarette, and that's about, about it. |
| Q: | What do you do the rest of the day? |
| A: | Try to help out as much as I can or try to read a book. And I don't even understand the book I read. |

---

[8] Administrative Record at 56-57 in case number 6:11-cv-2021-JSS.

[9] *Id.* at 58.

| Q: | Have you tried to do some volunteer work for a church? |
|---|---|
| A: | Yes. . . . |
| Q: | What do you do for the church? |
| A: | I clean, I help, I vacuum, I wipe down the counters, the tables, the chairs. And it helps me because they take their time with me and they work with me and I appreciate that. |
| Q: | Do you have a supervisor? |
| A: | Yes, I do. |
| Q: | And does he give you the time that you need to complete the job? |
| A: | Yes, she does. |
| Q: | How long do you do that a day, or do you do it every day? |
| A: | I was doing it every day for community service but now I do it like a couple days out of the week. |
| Q: | How long do you do it at a time? |
| A: | From 9:00 to 2:00. |

(Administrative Record at 59-60 in case number 6:11-cv-2021-JSS.)

### b.   *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who is able to:

> pick up 50 pounds on occasion, 25 pounds frequently. Sit up to six hours out of an eight hour workday. Stand and walk combined up to six hours out of an eight hour workday with normal breaks. No limitation on reach. They can climb stairs frequently, ladders frequently. No postural limits. No manipulation limits. No visual limits with glasses. There may be some communication limits in regards to reading and writing. Those would be somewhat limited. The person would not be qualified really to work jobs that involved any complex reading, writing, or heavy correspondence. Environmentally, no limits. However, the person at all times would likely have some . . . mild up to moderate limits on activities of daily living. Mild up to moderate limits on their social functioning and mild up to moderate limits on their concentration, persistence, and pace. If the individual is stressed, that is if they have strict time limits placed upon them

to perform or if they're subject to being watched on a fairly constant basis while performing their job they're not going to react to that very well, in other words, they will reach moderate limits in all those segments the greater the stress that they perceive that they are under. However, if they do not perceive stress, or they're not constantly watched, or they don't have really strict or severe time limits placed on them the person would generally function in all those segments in more of a mild fashion. And so there would be variable reaction depending upon the degree of stress. So it would be mild up to moderate in the areas of the ability to understand, remember, and carry out details; maintain extended concentration; interacting with the general public; working with their co-workers; accepting instruction and criticism from supervisors; and responding to changes in their work setting or their work routine. And, again, that's a variable type of a basis. The more the person perceives themselves being criticized or pressed the more apt they are to be in the moderate limits.

(Administrative Record at 64-66 in case number 6:11-cv-2021-JSS.) The vocational expert testified that under such limitations, Spratt would be able to perform his past relevant work as a sander, dietary aide, and floor wax machine operator. The ALJ changed the hypothetical question as follows:

Now if I changed the hypothetical though such that we've got a person who maybe in the moderate range most of the time up to sometimes marked, again, depending upon stress levels. The more they're stressed the more apt they will reach a marked level of limitation. Otherwise, most of the time they're already in the moderate level of limitation.

(Administrative Record at 66 in case number 6:11-cv-2021-JSS.) The vocational expert testified that under such a limitation, Spratt would be precluded from competitive employment.

Spratt's attorney also questioned the vocational expert. Spratt's attorney provided the vocational expert with the following hypothetical:

Assume an individual at age 27 at his onset date, currently 28. Completed high school but in a special education integrated

program. No vocational training. The physical restrictions that he had would be mostly due to fatigue and lack of energy and those would limit him to lifting both occasionally and frequently 20 to 25 pounds. He could stand combined about six hours in an eight hour day or he could sit about the same. His non exertional restrictions would be simple, routine, repetitive, unskilled work. No more than very basic reading, writing, and math skills. Limited, be limited to low stress work never more than a regular pace and a slow pace up to a third of the time or at least a third of the time due to fatigue and other symptoms of his mental impairments. Inability to understand, remember, and carry out more than one step work instructions on a consistent basis. He could do it at times and he could occasionally carry out one and two step instructions and more but on a consistent basis it would be no more than one step instructions. Limited to no contact with the public and co-workers. Occasional contact with supervisors. No close attention to detail or work around hazardous or moving machinery. At least moderate restrictions of activities of daily living, and maintaining social functioning, and also maintaining attention and concentration. But that would increase to a marked inability particularly to maintain attention and concentration ordinarily due to what he perceives to be stress in the work environment. And his functional limitations and the symptoms of his mental impairment together with some side affects of the medications that he has would result in absences of more than four days per month, or at least the inability to work six to eight hours per day without missing more than four days per month.

(Administrative Record at 67-68 in case number 6:11-cv-2021-JSS.) The vocational expert testified that under such limitations, Spratt would be precluded from competitive employment.

### C. *Spratt's Medical History*

On July 25, 2005, Spratt met with Dr. B.J. Dave, M.D., for a psychiatric evaluation. Spratt reported that he had been feeling depressed "off and on" for the past year. He stated that he was injured at his job, and subsequently let go from employment. He began using marijuana, methamphetamine, and cocaine "'[b]ecause I was feeling

depressed and I was using drugs to deal with my depression.'"[10] Spratt was hospitalized in 2004 and 2005 due to difficulties with depression. Dr. Dave noted that:

> [Spratt] indicated that with the help of his medication his depressive symptoms have improved during the past month. He currently sleeps well and has a good appetite. He complained of low energy and poor motivation when he was feeling depressed prior to his [2005] hospitalization[.] . . . He was also experiencing crying spells at that time and had felt hopeless and worthless at times. . . . He reported that when he was not on Lexapro, he was feeling irritable and had low frustration tolerance. He also complained of poor concentration and at times feeling jittery and restless.

(Administrative Record at 682 in case number 6:11-cv-2015-JSS.) Upon examination, Dr. Dave diagnosed Spratt with depressive disorder, history of polysubstance dependence, and borderline intellectual functioning. Dr. Dave opined that Spratt should continue to use Lexapro and refrain from using alcohol or illegal drugs.

On March 10, 2006, Dr. Rhonda Lovell, Ph.D., reviewed Spratt's medical records and provided Disability Determination Services ("DDS") with a psychiatric review technique and mental residual functional capacity ("RFC") assessment for Spratt. On the psychiatric review technique assessment, Dr. Lovell diagnosed Spratt with dyslexia, depressive disorder, mood disorder, impulsive control disorder, intermittent explosive disorder, and polysubstance dependence. Dr. Lovell determined that Spratt had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Lovell determined that Spratt was moderately limited in the ability to: carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods,

---

[10] Administrative Record at 682 in case number 6:11-cv-2015-JSS.

interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Lovell concluded that:

> [Spratt] appears to have a severe mental impairment that does not meet or equal a referenced listing. Based on [activities of daily living] and high school functioning, [Spratt] has the ability to understand and remember instructions and procedures for basic and detailed tasks. Concentration is no more than moderately reduced. Initial attitude at most recent employment, past . . . employment and [his] presentation suggest that he is capable of interacting appropriately with others when he wishes to do so. . . . [Spratt] has the ability to complete a typical work week when he is so motivated.

(Administrative Record at 623 in case number 6:11-cv-2015-JSS.)

On August 24, 2006, Dr. Dee Wright, Ph.D., reviewed Spratt's medical records and provided DDS with a mental RFC assessment. Dr. Wright determined that Spratt was moderately limited in the ability to: carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Wright concluded that Spratt's "allegation of a significant worsening of his condition [since March 2006] is not supported by the most recent evidence. [Spratt's] limitations of function to [sic] not currently meet or equal listing severity."[11]

On August 29, 2007, at the request of Spratt's attorney, Spratt met with Dr. Ralph Scott, Ph.D., for a psychological evaluation. During their interview, Dr. Scott noted that

---

[11] Administrative Record at 586 in case number 6:11-cv-2015-JSS.

Spratt was "[m]oderately distractible but not motorically over-active, [he] employed quite poor judgment, and short-term and remote memory functioning was moderately below age norms."[12] Dr. Scott also administered the Wechsler Adult Intelligence Scale-3 test to Spratt. The results of the test provided a verbal IQ score of 77, performance IQ score of 72, and full scale IQ score of 72. Dr. Scott interpreted the test results as follows:

> on current evaluation and when provided supportive encouragement within the limits of standard administrative procedures, [Spratt] scored within the category of Borderline Intellectual Functioning. Relative strengths appeared on rote short-term memory tasks and on long-term memory items. Conversely, marked and statistically significant weaknesses appeared in the domains of attending, processing and appropriately responding to new verbal information.

(Administrative Record at 537 in case number 6:11-cv-2015-JSS.) Dr. Scott diagnosed Spratt with major depressive disorder, recurrent and with bipolar features, post-traumatic stress disorder, polysubstance abuse, in possible remission, borderline intellectual functioning, and personality disorder with avoidant, borderline, dependent, paranoid, and schizotypal features. Dr. Scott assessed a GAF score of 42.

Dr. Deborah Garrelts, M.D., Spratt's treating psychiatrist, filled out a "Mental Impairment Questionnaire" at the request of Spratt's attorney.[13] In the questionnaire, Dr. Garrelts diagnosed Spratt with major depressive disorder, polysubstance abuse, and borderline intellectual functioning. Dr. Garrelts noted that Spratt had "good response" to Lexapro and Vistaril. Dr. Garrelts identified the following "signs and symptoms" of Spratt's mental impairments: decreased energy, history of suicidal thoughts, feelings of guilt and worthlessness, impairment in impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, paranoid thinking, history of substance dependence, emotional withdrawal or isolation, flight of ideas, illogical thinking,

---

[12] *Id.* at 532.

[13] The questionnaire is undated, but is contained in the administrative record for case number 6:11-cv-2015-JSS, Spratt's first application for social security benefits.

easy distractability, memory impairment, and oddities of thought, perception, speech, or behavior. Dr. Garrelts found that Spratt had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, or pace. Lastly, Dr. Garrelts opined that Spratt would on average, miss more than four days of work per month due to his impairments or treatment for his impairments.

In a letter dated November 6, 2008, Dr. Garrelts addressed Spratt's mental health condition. Dr. Garrelts diagnosed Spratt with depressive disorder, bipolar disorder, marijuana and cocaine dependence, in remission, and borderline intellectual functioning. With regard to his functional abilities, Dr. Garrelts opined that Spratt:

> would have difficulty understanding instructions, locations, and procedures and thus would not be able to follow through with tasks that are presented to him. Also, [Spratt's] ability to maintain attention and concentration is seriously limited. [He] has difficulty staying on task thus making it difficult for him to process information that is presented to him. [Spratt] is oftentimes impulsive and has not always exhibited good judgment. Changes in routine are challenging for [him]. He is an individual who does much better in a supportive, structured environment. Finally, Mr. Spratt's capacity for interacting appropriately with supervisors, co-workers, and the public is always dependent on his mental health condition at any given time.

(Administrative Record at 430 in case number 6:11-cv-2021-JSS.)

On February 5, 2009, Spratt was referred by DDS to Dr. Carroll D. Roland, Ph.D., for a psychological evaluation. Upon examination, Dr. Roland diagnosed Spratt with depressive disorder, cannabis dependence in full sustained remission, psychotic disorder, borderline intellectual functioning, and dependent personality features. Dr. Roland assessed a GAF score of 45-50. Dr. Roland concluded that:

> Spratt is a 27 year old single Caucasian male who appears to have a depressive disorder []. He may have a psychotic disorder []. . . . He clearly has a low frustration tolerance[.] . . . Intellectual functioning is borderline by

> history. His memory is poor but does not preclude working in
> a repetitive work environment with 1 and possibly 2 step
> instructions given by supervisory personnel. [Spratt] would
> have difficulty relating effectively to co-workers and
> supervisors. Working in an assembly line or in a factory
> where he is involved in a repetitive task is not beyond [his]
> capabilities. He will need to continue with outpatient
> psychiatric management of [his] medications.

(Administrative Record at 447-48 in case number 6:11-cv-2021-JSS.)

On March 11 and 13, 2009, Dr. Myrna Tashner, Ed.D., reviewed Spratt's medical records and provided DDS with a psychiatric review technique and mental RFC assessment for Spratt. On the psychiatric review technique assessment, Dr. Tashner diagnosed Spratt with borderline intellectual functioning, depressive disorder, dependent personality features, and polysubstance dependence in remission. Dr. Tashner determined that Spratt had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Tashner determined that Spratt was moderately limited in the ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Dr. Tashner concluded that:

> [Spratt] would be capable of simple unskilled instructions
> when motivated and in his interest. . . . His attention would
> vary w[ith] motivation and interest as would his pace. He
> would do better w[ith] little social interaction required for
> work completion. Change should be limited and then well
> demonstrated for successful completion.

(Administrative Record at 466 in case number 6:11-cv-2021-JSS.)

On August 25, 2009, at the request of Spratt's attorney, Dr. Garrelts filled out another "Mental Impairment Questionnaire." In the questionnaire, Dr. Garrelts diagnosed Spratt with depressive disorder, history of polysubstance dependence in sustained remission, and borderline intellectual functioning. Dr. Garrelts noted that Spratt had "fair-good" response to treatment with medication. Dr. Garrelts also opined that Spratt's prognosis was "fair-good." Dr. Garrelts found that Spratt had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, or pace. Lastly, Dr. Garrelts opined that Spratt would on average, miss more than four days of work per month due to his impairments or treatment for his impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

In both sets of applications, the ALJ determined that Spratt is not disabled. In making these determinations, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

## 1. *The ALJ's August 27, 2008 Decision*

The ALJ applied the first step of the analysis and determined that Spratt had not engaged in substantial gainful activity since October 1, 2005. At the second step, the ALJ concluded from the medical evidence that Spratt had the following severe impairments: depression, post traumatic stress disorder versus impulse control disorder versus intermittent explosive disorder, history of dyslexia, and substance abuse. At the third step, the ALJ found that Spratt did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Spratt's RFC as follows:

> If [Spratt] stopped the substance use, [he] would have the residual functional capacity to perform the full range of medium work . . . in that the individual could lift 50 pounds occasionally and 25 pounds frequently; sit 6 hours in an 8 hour work day; stand and walk, combined, 6 hours in an 8 hour work day; no limitation in the operation of hand and foot controls; no postural limitations, no manipulation limitations; no visual limitations with glasses; and no environmental limitations. The individual would not be able to perform any

task involving complex reading or writing such as correspondence. The individual, however, at all times would have mild to moderate limitations regarding activities of daily living, mild to moderate limitations with respect to social functioning; and mild to moderate limitations regarding concentration, persistence, and pace. If the individual refrained from the use of illegal substances or alcohol, the person would generally function in the mild range in those respects. Yet, under stress, the individual could reach moderate limitations in regard to the ability to understand, remember, and carry out detailed instructions, maintain extended concentration, interact appropriately with the general public, work with co-workers or in proximity to co-workers, accept instruction or criticism from supervisors, respond to changes in the work setting or work routine. Those moderate limits would be reached on an intermittent and unexpected basis, depending upon the degree of stress the person experiences. Normally, the individual would be able to keep pace until somebody starts criticizing or pressing them for more.

(Administrative Record at 30 in case number 6:11-cv-2015-JSS.) Also under the fourth step, the ALJ determined that if Spratt stopped the substance use, he would be able to perform his past relevant work as a sander, cleaner, fast food worker, and dietary aide. Therefore, the ALJ concluded that Spratt was not disabled.

## 2. *The ALJ's April 19, 2010 Decision*

The ALJ applied the first step of the analysis and determined that Spratt had not engaged in substantial gainful activity since August 28, 2008. At the second step, the ALJ concluded from the medical evidence that Spratt had the following severe impairments: depressive disorder, bipolar disorder, borderline intellectual functioning, post traumatic stress disorder, personality disorder, and cannabis disorder in full sustained remission. At the third step, the ALJ found that Spratt did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Spratt's RFC as follows:

[Spratt] has the residual functional capacity to perform medium work . . . except that [he] can climb stairs and ladders

22

frequently. He has visual limits with glasses and some communication limits with reading and writing; he should not be asked to do complex reading/writing or tasks requiring any heavy correspondence. [Spratt] has mild to moderate limits in activities of daily living, social functioning, and in concentration, persistence, and pace. If he is stressed and given strict time limits to perform, or is watched constantly, he will not react well. He has moderate limits in all segments the greater the stress he perceives. If he does not perceive stress or is not watched strictly or given severe time limits, he will function in more of a mild fashion (so it is a variable reaction depending on stress). He will have mild to moderate limitations in understanding, remembering, and carrying out details, maintaining extended concentration, interacting with the general public and co-workers, accepting criticism and supervision from supervisors, and responding to changes in work setting and routine.

(Administrative Record at 19-20 in case number 6:11-cv-2021-JSS.) Also at the fourth step, the ALJ determined that Spratt could perform his past relevant work as a sander, dietary aide, and floor wax machine operator. Therefore, the ALJ concluded that Spratt was not disabled.

## B. Objections Raised By Claimant

With regard to the ALJ's 2008 decision, Spratt argues that the ALJ's finding that his substance use was a contributing factor material to the determination of disability was not based on substantial evidence. With regard to both the ALJ's 2008 and 2010 decisions, Spratt argues that the ALJ erred in four respects. First, Spratt argues that the ALJ erred by failing to find that his borderline intellectual functioning meets or equals Listing 12.05C. Second, Spratt argues that the ALJ failed to properly weigh the opinions of his treating psychiatrist, Dr. Garrelts. Third, Spratt argues that the ALJ's RFC finding is not based on substantial evidence. Lastly, Spratt argues that the ALJ failed to properly evaluate his subjective allegations of disability.

## 1. *Substance Abuse*

Spratt apparently concedes that the ALJ "*did* follow the methodology for determining whether substance use is a contributing factor material to the determination of disability[.]" (Emphasis added.)[14] Spratt takes issue with the ALJ's conclusion that if he stopped his substance use, he would not be disabled and have the functional capacity to perform his past work as a sander, cleaner, fast food worker, or dietary aide. Instead, Spratt argues that even if substance use is removed as a factor in determining disability, he has non-substance abuse impairments which support a finding of disability. Therefore, Spratt concludes that the ALJ's decision is not based on substantial evidence on the record as a whole. In response, the Commissioner asserts that:

> Ultimately, it appears that it is not the ALJ's procedure that [Spratt] is contending was in error, but the ALJ's finding that [Spratt's] substance abuse was a contributing factor material to a finding of disability. However, . . . the ALJ articulated appropriate bases for his findings regarding [Spratt's] credibility and the weight given to the medical opinions, and properly determined [Spratt's] RFC. . . . This is substantial evidence supporting the ALJ's finding that [Spratt's] substance use was a contributing factor material to the determination of disability and finding that [Spratt] was not disabled.

Commissioner's Brief (docket number 17) at 33 in case number 6:11-cv-2015-JSS. While it is somewhat unclear whether the Court needs to address this issue, for purposes of clarity, the Court will review the ALJ's substance abuse analysis in order to determine whether his analysis was properly performed.

In 1996, Congress amended the Social Security Act to eliminate benefits for disabilities arising from addiction to alcohol or other drugs. *See* Pub. L. No. 104-121, 110 Stat. 847; *see also Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) (discussing the 1996 Congressional amendment); *Jackson v. Apfel*, 162 F.3d 533, 537 (8th Cir. 1998) (same). The regulations implemented this law at 20 C.F.R. § 404.1535 (relating to applications for disability insurance benefits) and 20 C.F.R. § 416.935

---

[14] Spratt's Brief (docket number 16) at 28 in case number 6:11-cv-2015-JSS.

(relating to applications for SSI benefits). The two sections are identical and provide as follows:

> How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (a)  General.  If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (b)  Process we will follow when we have medical evidence of your drug addiction or alcoholism.
>
>> (1)  The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>>
>> (2)  In making this determination, we will evaluate which of your current physical an mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>>
>> (I)  If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>>
>> (ii)  If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535, 416.935.

According to the regulations, the ALJ must first determine whether the claimant is disabled. *See* 20 C.F.R. §§ 404.1535, 416.935 (*"If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." (emphasis added)). "The ALJ must reach this determination initially . . . using the five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders." *Brueggemann*, 348 F.3d at 694 (citation omitted). If the ALJ determines that all of a claimant's limitations, including the effects of substance use disorders, show that the claimant is disabled, then the ALJ "must next consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694-95 (citing *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000); 20 C.F.R. § 404.1535(b)(2)). "The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause." *Pettit*, 218 F.3d at 903 (citations omitted). The claimant carries the burden of proving that alcoholism or drug addiction is not a material factor to the finding of disability. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)). "If the ALJ is unable to determine whether substance abuse disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow. . . . In colloquial terms, on the issue of materiality of alcoholism, a tie goes to [the claimant]." *Brueggemann*, 348 F.3d at 693 (citation omitted). Accordingly, the ALJ is required to develop a full and fair record and support his or her conclusions with substantial evidence. *Id.* at 695. In summary, "[o]nly after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism[,] . . . may [the ALJ] then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability." *Id.*

Here, the ALJ followed the analytical framework set forth in the regulations. The ALJ first applied the five-step sequential evaluation process for determining whether an individual is disabled, and determined that Spratt was disabled based on his impairments, including his substance abuse disorder.[15] Next, the ALJ determined that if Spratt stopped the substance use, he would continue to have a severe impairment or combination of impairments. The ALJ concluded, however, that absent the substance use, his remaining limitations were not disabling.[16] Therefore, having reviewed the entire record, the Court finds that the ALJ properly analyzed the issue of Spratt's substance abuse in accordance with both the law and Social Security Regulations. At this point, the Court makes no determination on the ALJ's conclusion that absent the substance use, Spratt is not disabled. Instead, the Court will address the remaining issues raised by Spratt on appeal, and determine whether absent substance use there is substantial evidence on the record as a whole to support the ALJ's disability determination.

### 2.    *Listing 12.05C*

Spratt argues that the ALJ erred in both decisions by failing to find that he meets or equals Listing 12.05C. In particular, Spratt contends that the evidence in the record supports a finding that he equals Listing 12.05C. Spratt concludes that the ALJ's decisions should be reversed, or "at least" remanded for further consideration of whether he equals Listing 12.05C.

Listing 12.05C provides in pertinent part:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

---

[15] *See* Administrative Record at 22-28 in case number 6:11-cv-2015-JSS.

[16] *Id.* at 29-32.

. . .

> C. A valid verbal, performance, or full scale IQ of 60 through
> 70 and a physical or other mental impairment imposing an
> additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. In *Maresh v. Barnhart*, 438 F.3d 897 (8th

Cir. 2006), the Eighth Circuit summarized the requirements of Listing 12.05C as follows:

> a claimant must show: (1) a valid verbal, performance, or full
> scale IQ of 60 through 70; (2) an onset of the impairment
> before age 22; and (3) a physical or other mental impairment
> imposing additional and significant work-related limitation of
> function.

*Id*. at 899.

Here, Spratt scored a verbal IQ score of 77, a performance IQ score of 72, and a

full IQ score of 72 in August 2007. Clearly, Spratt does not meet the first requirement of

Listing 12.05C, as none of his IQ scores are between 60 and 70. While the apparent

conclusion is Spratt does not *meet* the requirements of Listing 12.05C, Spratt contends that

the ALJ erred because he did not address whether his impairments *equaled* Listing 12.05C.

Spratt is correct.

In *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), the Eighth Circuit pointed

out that the Commissioner issued instructions for determining medical equivalence in the

Program Operations Manual System ("POMS")." *Id*. at 424. The applicable POMS

provision for determining medical equivalence and mental retardation under Listing

12.05C states in pertinent part:

> Listing 12.05C is based on a combination of an IQ score with
> an additional significant mental or physical impairment. The
> criteria of this paragraph are such that a medical equivalence
> determination would very rarely be required. However,
> slightly higher IQ's (e.g. 70-75) in the presence of other
> physical or mental disorders that impose additional and
> significant work-related limitation or function may support an
> equivalence determination. It should be noted that generally
> the higher the IQ, the less likely medical equivalence in

combination with another physical or mental impairment(s) can be found.

POMS § DI 24515.056. In *Shontos*, the claimant had an IQ score of 72, and medical evidence from her treating doctors which indicated that she had difficulty with anxiety and depression which would interfere with her ability to work. 328 F.3d at 424. The ALJ who considered Shontos' claim did not consider the POMS guidelines. *Id.* The Eighth Circuit determined that the ALJ's failure to consider the POMS guidelines was error. *Id.* Specifically, the Eighth Circuit found that "[a]lthough POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines." *Id.* (citing *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000); *List v. Apfel*, 169 F.3d 1148, 1150 (8th Cir. 1999)). The Eighth Circuit concluded that Shontos' impairments, including borderline intellectual functioning, psychiatric affective disorders, and physical disabilities, were medically equivalent to Listing 12.05C, and remanded the case for an award of benefits. *Shontos*, 328 F.3d at 427.

Similar to *Shontos*, Spratt had a performance IQ score of 72 and a full IQ score of 72 in August 2007. Dr. Scott interpreted the test results as follows:

> [Spratt] scored within the category of Borderline Intellectual Functioning. Relative strengths appeared on rote short-term memory tasks and on long-term memory items. Conversely, marked and statistically significant weaknesses appeared in the domains of attending, processing and appropriately responding to new verbal information.

(Administrative Record at 537 in case number 6:11-cv-2015-JSS.) Dr. Scott diagnosed Spratt with major depressive disorder, recurrent and with bipolar features, post-traumatic stress disorder, polysubstance abuse, in possible remission, borderline intellectual functioning, and personality disorder with avoidant, borderline, dependent, paranoid, and schizotypal features. Dr. Scott assessed a GAF score of 42.[17]

---

[17] A GAF score between 41 and 50 "reflects *serious limitations* in the patient's (continued...)

Additionally, in 2008, Dr. Garrelts, Spratt's treating psychiatrist, diagnosed Spratt with depressive disorder, bipolar disorder, marijuana and cocaine dependence in remission, and borderline intellectual functioning. With regard to his functional abilities, Dr. Garrelts opined that Spratt:

> would have difficulty understanding instructions, locations, and procedures and thus would not be able to follow through with tasks that are presented to him. Also, [Spratt's] ability to maintain attention and concentration is seriously limited. [He] has difficulty staying on task thus making it difficult for him to process information that is presented to him. [Spratt] is oftentimes impulsive and has not always exhibited good judgment. Changes in routine are challenging for [him]. He is an individual who does much better in a supportive, structured environment. Finally, Mr. Spratt's capacity for interacting appropriately with supervisors, co-workers, and the public is always dependent on his mental health condition at any given time.

(Administrative Record at 430 in case number 6:11-cv-2021-JSS.) In February 2009, Dr. Roland diagnosed Spratt with depressive disorder, cannabis dependence in full sustained remission, psychotic disorder, borderline intellectual functioning, and dependent personality features. Dr. Roland assessed a GAF score of 45-50.[18] In August 2009, Dr. Garrelts diagnosed Spratt with depressive disorder, history of polysubstance dependence in sustained remission, and borderline intellectual functioning. Dr. Garrelts found that Spratt had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and *extreme* difficulties in maintaining concentration, persistence, or pace.

Based on the foregoing medical opinions, the Court finds that the ALJ's failure to follow the POMS guidelines, and consider whether Spratt's borderline intellectual

---

[17](...continued)
general ability to perform basic tasks of daily life." *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (emphasis added).

[18] *Id.*

functioning combined with his other significant mental impairments, were medically equivalent to Listing 12.05C was error.[19] *See Shontos*, 328 F.3d at 424-27. Accordingly, the Court determines that remand is necessary. On remand, the ALJ must determine whether Spratt's impairments are medically equivalent to Listing 12.05C.

### 3. Dr. Garrelts' Opinions

Spratt argues that the ALJ failed to properly evaluate the opinions of his treating psychiatrist, Dr. Garrelts. Specifically, Spratt argues that the ALJ's reasons for discounting Dr. Garrelts' opinions are not supported by substantial evidence in the record. Spratt requests that this matter be remanded to the ALJ for a proper evaluation of Dr. Garrelts' opinions.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v.*

---

[19] The Court notes that with regard to the other criteria for Listing 12.05C, there is ample evidence that the impairment existed before Spratt was 22. In addition to being in special education classes throughout his entire school career, he also had IQ scores well below 70 in both elementary and middle school. As for the third element, showing a mental impairment imposing additional and significant work-related limitation of function, there is evidence in the record that Spratt has multiple diagnoses of depression and personality disorder which affect his social functioning and ability to maintain concentration, persistence, and pace.

*Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

Furthermore, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately

developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Additionally, an ALJ is not required to "seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (citation omitted). An ALJ should only contact a treating physician "if the doctor's records are 'inadequate for us to determine whether the claimant is disabled' such as 'when the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" *Goff*, 421 F.3d at 791 (citing 20 C.F.R. §§ 404.1512(e) and 416.912(e)).

In his 2008 decision, the ALJ addressed the opinions of Dr. Garrelts as follows:

> Although some weight is accorded to the opinion of the treating psychiatrist, Dr. Garrelts, progress notes did not fully support the opinions provided. The checklist completed at the request of [Spratt's] representative by Dr. Garrelts was not dated and did not clearly reflect the treatment period for which the opinion was made. For example, the psychiatrist opined [Spratt] exhibited extreme functional limitations with respect to maintaining concentration, persistence, and pace. Yet, the record reflected [Spratt] retained an ability to participate in and successfully complete drug treatment programs; participate in constructing ramps with no reported difficulty in connection with community service; and work puzzles immediately after completing a six-week substance abuse treatment program, all of which demonstrate higher functional ability.

(Administrative Record at 31-32 in case number 6:11-cv-2015-JSS.) In his 2010 decision, the ALJ again considered Dr. Garrelts' opinions:

> In a letter date [*sic*] November 6, 2008, [Spratt's] treating physician, Deborah Garretts [*sic*], wrote:
>
> 'In regard to Mr. Spratt's ability, it is this writer's impression that he would have difficulty understanding instructions, locations, and procedures and thus would not be able to follow through with tasks that are presented to him. Also, [Spratt's] ability to maintain attention and concentration is seriously limited. [He] has difficulty staying on task thus making it

difficult for him to process information that is presented to him. [Spratt] is oftentimes impulsive and has not always exhibited good judgment. Changes in routine are challenging for [him]. He is an individual who does much better in a supportive, structured environment. Finally, Mr. Spratt's capacity for interacting appropriately with supervisors, co-workers, and the public is always dependent on his mental health condition at any given time.'

Further, in a Mental Residual Functional Capacity Questionnaire, Dr. Garretts [sic] marked indicators that showed she felt [Spratt] was unable to sustain gainful employment. In contrast, the undersigned notes that the doctor's contemporaneous treatment notes provided no such limitation or restriction on [Spratt's] ability to engage in substantial gainful activity. In fact, despite the specificity of the limitations contained in the above document, Dr. Garretts [sic] consistently rate [Spratt] with a Global Assessment of Functioning (GAF) score of 55. . . . A rating of 55 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. In addition, the above referenced documentation is inconsistent with the objective medical evidence as a whole. . . . Opinions on issues reserved to the Commissioner, such as those of the doctors reported above, can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence. Further, the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Spratt], and seemed to uncritically accept as true most, if not all, of what [Spratt] reported. . . . In addition, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requires and avoid unnecessary doctor/patient tension. While it is difficult to confirm such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. As such, the undersigned

> affords great weight to the treatment notes of Dr. Garretts [*sic*], but very little weight to the impairment questionnaires and narrative reports they completed at [Spratt's] representative's request.

(Administrative Record at 21-22 in case number 6:11-cv-2021-JSS.)

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). Lastly, if a crucial issue is undeveloped, the ALJ should recontact the treating physician for clarification of the issue. *Stormo*, 377 F.3d at 806. While this is a close issue, the Court finds that the ALJ has not fully met these requirements. First, in the ALJ's 2008 decision, the ALJ simply provided a generic and conclusory statement that Dr. Garrelts' progress notes did not fully support her opinions. The ALJ failed to explain how or why Dr. Garrelts' progress notes were inconsistent with her opinions. Second, with regard to a questionnaire Dr. Garrelts filled out, the ALJ stated "[t]he checklist completed at the request of [Spratt's] representative by Dr. Garrelts was not dated and did not clearly reflect the treatment period for which the opinion was made."[20] The ALJ proceeded to raise questions about the accuracy of the questionnaire with regard to Spratt's limitations in concentration, persistence, and pace, even though he was uncertain of "the treatment period for which the opinion was made." Even though the ALJ's questions are pertinent and may even be correct, the fact that the ALJ also indicated uncertainties with regard to Dr. Garrelts' opinions suggests that a crucial issue was undeveloped. Thus, further clarification from Dr. Garrelts is proper. *See Stormo*, 377 F.3d at 806. This issue is particularly significant because in addition to Dr. Garrelts' opinions, several treating and non-treating doctors opine that Spratt has moderate to serious

---

[20] Administrative Record at 31 in case number 6:11-cv-2015-JSS.

limitations in the area of concentration, persistence, and pace. As Spratt's treating psychiatrist, the Court believes that if an ALJ has concerns that the treating physician's opinions are inadequate or do not contain all the necessary information, the proper course is for the ALJ to recontact the treating physician for clarification of her opinions. *See Goff*, 421 F.3d at 791.

Turning to his 2010 decision, the ALJ points out that in a questionnaire, Dr. Garrelts indicated Spratt was unable to sustain gainful employment, but did not offer a similar opinion in her treatment notes. The Court is unconvinced that this is a "good" reason for disregarding Dr. Garrelts' opinions because treatment notes are different from functional ability questionnaires. Specifically, unlike in functional ability questionnaires, opinions regarding the ability to sustain employment are not generally issued discussed or addressed in treatment notes. Second, the ALJ points out that Dr. Garrelts' GAF scores indicate that overall Spratt has moderate symptoms. While this may be true, simply because Spratt's overall symptoms may be categorized as moderate does not mean that he does not have "extreme" limitations in the area of concentration, persistence, and pace. Third, the ALJ offers a conclusory statement that Dr. Garrelts' opinions are "inconsistent with the medical evidence as a whole," but fails to explain this statement or offer any examples of where her opinions are inconsistent with the medical evidence as a whole. In reviewing the entire record, the Court finds that there is consistent evidence from both treating and non-treating doctors that Spratt has moderate to serious limitations in the area of concentration, persistence, and pace. Lastly, the ALJ suggests that Dr. Garrelts' opinions cannot be trusted because she *may* have relied too heavily on Spratt's subjective reports, offered her opinions because she sympathized with Spratt, and/or offered her opinions to avoid tension in her treating relationship with Spratt. The ALJ admits that it is "difficult to confirm such motives," and the Court finds that these reasons do not constitute "good" reasons for disregarding Dr. Garrelts' opinions.

While this is a close issue, the Court believes that given Spratt's borderline intellectual functioning and the concerns raised by multiple treating and non-treating

sources regarding his abilities in the area of concentration, persistence and pace, remand is appropriate for further development of Dr. Garrelts' opinions. Accordingly, the Court finds that on remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Garrelts' opinions and support his reasons with evidence from the record. Additionally, on remand, the ALJ must recontact Dr. Garrelts in order to clarify her opinions on any undeveloped crucial issues.

### 4.    *RFC Determination*

Spratt argues that the ALJ in both decisions, failed to fully and fairly develop the record with regard to his RFC assessment. Specifically, Spratt asserts that the ALJ failed to properly consider or address the opinions of Dr. Garrelts, his treating psychiatrist, in making the RFC determination. Spratt concludes that his cases should be remanded for further consideration of his RFC.

An ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)). In considering medical evidence, an ALJ may "'reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall*, 274 F.3d at 1219).

In section *V.B.3*, the Court determined that remand was necessary because the ALJ failed to fully and fairly develop the record with regard to the opinions of Dr. Garrelts, Spratt's treating psychiatrist. Because the ALJ did not fully and fairly develop the record

with regard to Dr. Garrelts' opinions, the Court finds that the ALJ's RFC assessments in both decisions are not based on all of the relevant evidence. *See Guilliams*, 393 F.3d at 803. Accordingly, the Court determines that remand is necessary in order that the ALJ make his RFC assessment for Spratt based on all the relevant evidence, including the opinions of Dr. Garrelts.

### 5.    *Credibility Determination*

Spratt argues that the ALJ failed in both decisions, to properly evaluate his subjective allegations of disability. Spratt maintains that the ALJ's credibility determinations are not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Spratt's testimony in both decisions, and properly evaluated the credibility of his subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The absence of objective medical evidence to support a claimant's subjective complaints is also a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). The ALJ, however, may not disregard a claimant's subjective complaints "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe*

*v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

In his 2008 decision, the ALJ determined that:

> If [Spratt] stopped the substance use, the undersigned finds [Spratt's] medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [Spratt's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible. The record documented a positive response subsequent to medical and substance abuse treatment resulting in decreased irritability, improved mood, good appetite, less sleep disturbance, and an ability to engage in activities requiring concentration and social interaction. [Spratt]

> participated in community service, attended AA and NA meetings, cared for his personal needs, prepared meals, performed housework and yard work, cared for a pet, and drove to appointments. He indicated he experienced significant improvement secondary to his medication regimen and appropriate medical management.

(Administrative Record at 31 in case number 6:11-cv-2015-JSS.) In his 2010 decision, the ALJ determined that:

> After careful consideration of the evidence, the undersigned finds [Spratt's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Spratt's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Administrative Record at 21 in case number 6:11-cv-2021-JSS.)

In both decisions, the ALJ properly set forth the law for making credibility determinations under *Polaski* and the Social Security Regulations. While the 2008 decision contains reasons for his credibility determination which contemplate *Polaski*, the 2010 decision is devoid of any reasons for his credibility determination. In fact, it is questionable whether the ALJ even made a credibility determination in the 2010 decision. The ALJ simply concluded that Spratt's testimony was "inconsistent with the above residual functional capacity assessment."[21] The ALJ offers no examples of any inconsistencies between Spratt's testimony and the evidence in the record. The ALJ also fails to discuss any of the *Polaski* factors as they relate to Spratt's testimony. Therefore, the Court finds that the ALJ has failed in his duty to make an express credibility determination, detailing the reasons for discrediting the testimony, and setting forth inconsistencies in the record with regard to the 2010 decision. *Baker*, 159 F.3d at 1144; *see also Ford*, 518 F.3d at 982 (When making a credibility determination, an ALJ is required to "'detail the reasons for discrediting the testimony and set forth the

_____

[21] Administrative Record at 21 in case number 6:11-cv-2021-JSS.

inconsistencies found.'") (Quotation omitted.) Because the ALJ's 2010 decision lacks any explanation or discussion of the alleged inconsistencies between Spratt's testimony and the medical evidence, or full consideration of any of the *Polaski* factors, the Court determines that remand is appropriate for the ALJ to further develop the record with regard to Spratt's credibility. Therefore, on remand, the ALJ shall set forth in detail his reasons for finding Spratt's subjective allegations to be credible or not credible. If on remand, the ALJ finds Spratt's testimony not to be credible, the ALJ shall fully explain the reasons for his credibility determination and fully explain the inconsistencies between Spratt's subjective allegations and the evidence in the record.[22]

## C. *Reversal or Remand*

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that

---

[22] Even though the ALJ's credibility determination in the 2008 decision is much less problematic than his credibility determination in the 2010 decision, the Court believes that further consideration of Spratt's testimony is appropriate in the 2008 decision, which is also being remanded for further consideration of Listing 12.05, Dr. Garrelts' opinions, and Spratt's RFC assessment.

the claimant is not disabled). In the present cases, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, in both cases, the ALJ simply failed to: (1) determine whether Spratt's impairments are medically equivalent to Listing 12.05C; (2) fully and fairly develop the record with regard to the opinions of Dr. Garrelts; (3) make RFC assessments based on all the relevant evidence in both cases; and (4) make a proper credibility determination in these matters. Accordingly, the Court finds that remand is appropriate.

## *VI. CONCLUSION*

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ must determine whether Spratt's impairments are medically equivalent to Listing 12.05C. The ALJ shall provide clear reasons for accepting or rejecting Dr. Garrelts' opinions and support his reasons with evidence from the record. Furthermore, the ALJ must make his RFC determination based on all the relevant evidence, including the opinions of Dr. Garrelts. Finally, the ALJ must also make proper credibility determinations, and address his reasons in detail, for crediting or discrediting Spratt's subjective allegations of disability.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

These matters (case number 6:11-cv-2015-JSS and case number 6:11-cv-2021-JSS) are **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 2nd day of April, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA